UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTINA MARIE MERCOGLIANO,    )
                                )
            Plaintiff,           )
                                )
v.                               )            Civil No. 17-11276-LTS
                                )
NANCY A. BERRYHILL,             )
                                )
            Defendant.           )

MEMORANDUM AND ORDER

September 13, 2018

SOROKIN, J.

Christina Marie Mercogliano seeks reversal and remand of a decision by the Acting

Commissioner of the Social Security Administration ("the Commissioner") denying her

Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Doc. No. 17.

The Commissioner seeks an order affirming her decision. Doc. No. 24. For the reasons that

follow, Mercogliano's Motion for Judgment on the Pleadings to Reverse and/or Remand the

Decision of the Commissioner is DENIED, and the Commissioner's Motion to Affirm the

Commissioner's Decision is ALLOWED.

I.      BACKGROUND

        A.      Procedural History

        On October 9, 2012, Mercogliano applied for SSI and DIB, alleging an onset of disability

of January 1, 2010. A.R. at 334-50.[1] Her applications were denied initially on January 7, 2013

---

[1] Citations to "A.R." are to the administrative record, which appears as Document 10 on the docket in this matter. Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

1

and upon reconsideration on May 3, 2013. Id. at 245-50, 260-65. On June 11, 2013, Mercogliano requested a hearing before an administrative law judge ("ALJ"). Id. at 266-67. A hearing was held on February 19, 2014. Id. at 157-80. By decision on March 24, 2014, the ALJ found Mercogliano was not disabled. Id. at 223-38.

Thereafter, Mercogliano requested review of the ALJ's decision. Id. at 301-302. The Appeals Council granted Mercogliano's request for review, and in an order dated August 13, 2015 remanded the case for a new hearing and decision.[2] Id. at 239-44. A hearing was held before a different ALJ on December 10, 2015; the hearing included testimony by a vocational expert ("VE"). Id. at 107-52. That same day Mercogliano amended her onset date to May 20, 2010. Id. at 366. The ALJ issued a written decision dated February 2, 2016 finding that Mercogliano was not disabled. Id. at 65-93. Mercogliano filed a timely request for review, which the Appeals Council denied on May 12, 2017, rendering the ALJ's 2016 determination the final decision of the Commissioner. Id. at 1-6. Mercogliano filed this action appealing the Commissioner's decision on July 12, 2017. Doc. No. 1.

B.      Mercogliano's Physical Impairments

In her applications, Mercogliano claimed she suffered from a severe physical impairment, reflex sympathetic dystrophy ("RSD"), in her right foot. A.R. at 406. The record contains the following relevant evidence regarding her physical impairments:

- On May 20, 2010, Mercogliano presented at the Whidden Memorial Hospital emergency department complaining of pain in her great right toe, after a carpet cutting

---

[2] The Appeals Council concluded that the ALJ had articulated a residual functional capacity that did not adequately account for the severe mental impairments he found; that the ALJ's decision did not reflect consideration of reports by state agency psychological consultants; and that the ALJ had not reconciled his finding of moderate restrictions in social functioning with his determination that Mercogliano could return to her past work as a salesperson. A.R. at 241-42.

machine rolled over her foot while she was working at Home Depot. Id. at 914.

Mercogliano was diagnosed with a right foot contusion and discharged in a stable

condition. Id. at 915.

- On May 25, 2010, Mercogliano presented to Dr. Parra Tomkins at Ball Square Family

  Medicine, complaining of pain in her right foot and difficulty walking. Id. at 653. Dr.

  Tomkins noted a limp, but no obvious swelling or bruising. Id. at 653. She prescribed

  a walking boot, ice, and oxycodone, and referred Mercogliano to a podiatrist. Id.

- On June 1, 2010, Mercogliano went to Dr. Joseph Murano, a podiatrist, complaining

  of numbness and tingling along the side of her right foot, and shooting pain along the

  second toe of her right foot. Id. at 651. Dr. Murano found mild tenderness and noted

  two possible mild nerve compressions in her right foot. Id. at 652.

- On August 25, 2010, Mercogliano visited Dr. Cho-Park at Brigham and Women's

  Hospital for a neurological exam. Id. at 639. Mercogliano complained of a tingling

  sensation and pain around the right foot. Id. at 640. Dr. Cho-Park found that the

  relevant area did not fit within a nerve distribution; the exam was otherwise

  unremarkable. Id. Dr. Cho-Park noted that Mercogliano may have had the beginnings

  of RSD, and recommended Neurontin, physical therapy, and referral to a pain

  specialist. Id. at 641. Dr. Cho-Park also encouraged Mercogliano to work in a role

  that would not stress her foot. Id.

- On August 27, 2010, Mercogliano returned to Dr. Tomkins complaining of persistent

  pain in her right foot, swelling in her right foot when she was up on her feet, and an

  inability to perform her prior work duties. Id. at 637. In her appointment notes, Dr.

  Tomkins indicated that Mercogliano could walk for exercise. Id. Dr. Tomkins found

the right great toe was tender to touch, with no obvious swelling or bruising, and prescribed Gabapentin. Id. at 638.

- On October 5, 2010, Mercogliano visited a pain medicine specialist, Dr. Sasa Periskic. Id. at 632. Mercogliano complained of pain that radiated from her right foot, up into her lower right back, and occasional numbness in her toes. Id. at 632. Dr. Periskic noted Mercogliano had tried nonsteroidal anti-inflammatory drugs, muscle relaxants, and physical therapy without significant improvement, but that she had not tried long-acting narcotics or steroid injections. Id. Dr. Periskic found coldness, limited range of motion, pain, tingling sensations, and excessive sensitivity to touch in Mercogliano's right foot, as well as a limp and an inability to walk on heels and toes. Id. at 633. Dr. Periskic diagnosed right lumbar radiculopathy (compression or inflammation of a spinal nerve); RSD; chronic pain; and low back pain. Id. at 634. Dr. Periskic prescribed physical therapy, Neurontin, and an antidepressant, and suggested that Mercogliano may benefit from MRI and injection therapy. Id.

- On November, 2, 2010, Mercogliano returned to Dr. Tomkins reporting that she had not returned to work due to persistent pain, which increased after walking. Id. at 629. Physical examination found tenderness along the bones of the great right toe, no obvious swelling or bruising, pain with moving toes, and that this area was slightly cooler to the touch than the rest of the foot. Id. at 630. Dr. Tomkins diagnosed possible RSD, making the same findings she had noted in August 2010. Id. at 630-31.

- On January 7, 2011, Mercogliano saw Dr. Tomkins and reported extreme pain anytime her right foot was banged, bumped, or touched, with Gabapentin providing minimal relief. Id. at 623. Dr. Tomkins's findings and diagnosis remained unchanged. Id.

- On February 11, 2011, Mercogliano saw neurologist Dr. Vladan P. Milosavljevic and reported severe pain and numbness in her right foot. Id. at 469. Dr. Milosavljevic observed limited movements in her right foot, decreased pain sensation, and a limp. Id. at 470. He diagnosed right foot contusion and mild RSD. Id. at 471. He further opined that she was capable of doing work while sitting, that she should not stand for more than fifteen minutes per hour, that she should not lift more than ten pounds, and that she should not climb, squat, or kneel. Id. Dr. Milosavljevic believed Mercogliano's partial disability was temporary, that her condition could improve, and he recommended a bone scan. Id.

- On January 26, 2012, Mercogliano visited orthopedic surgeon Dr. Mark Slovenkai,[3] who found a limp and mild discoloration of the right foot. Id. at 828-9. He noted Mercogliano had difficulty bending her toes, decreased sensation, and limited range of ankle-motion. Id. at 829. Dr. Slovenkai diagnosed right foot contusion with temporary loss of motor or sensory function due to the blockage of nerve conduction, mild RSD, and mild gait abnormalities. Id. Dr. Slovenkai opined that Mercogliano could return to light-duty work with permanent restrictions limiting standing to fifteen minutes per hour; and excluding squatting, kneeling, climbing, and lifting more than twenty-five pounds. Id. at 829-30. Dr. Slovenkai believed Mercogliano had reached maximal medical improvement, with no need for ongoing treatment except for continued Neurontin management and occasional pain clinic follow up. Id. at 830.

- On May 8, 2012, Mercogliano saw Dr. Tomkins and complained that she was experiencing increased foot and leg pain as a result of more time on her feet "taking

---

[3] The ALJ mistakenly refers to Dr. Slovenkai as "Dr. Rosenblatt." A.R. 75, 81.

care of two other children for a family member." Id. at 880. Dr. Tomkins increased her Gabapentin. Id. at 881.

- On November 6, 2013,[4] Mercogliano told Dr. Tomkins that her foot pain persisted. Id. at 844. Her foot was cool and sensitive to touch, with two toes curling in and tender. Id. at 846. Gabapentin was continued. Id.

- That same day, Dr. Tomkins filled out a Multiple Impairment Questionnaire in which she diagnosed right foot contusion with RSD. Id. at 892. Dr. Tomkins noted that Mercogliano's prognosis was poor, as her pain had increased over time despite medications, and she had failed physical therapy and electrotherapy. Id. Mercogliano's primary symptoms were pain (rated moderate to moderately-severe), difficulty with activities, decreased sensation, and fatigue from medication. Id. at 893-94. Dr. Tomkins opined that in an eight-hour workday, Mercogliano could sit for up to one hour, stand or walk for up to one hour, and lift or carry up to ten pounds, with significant limitations on repetitive lifting. Id.

- On October 31, 2014, Mercogliano returned to Dr. Milosavljevic and reported no significant improvement since 2011. Id. at 1000. Dr. Milosavljevic's diagnoses and opinion were unchanged. Id. at 1000-02. Dr. Milosavljevic reiterated his belief that Mercogliano had not reached maximal medical improvement, suggested that she may benefit from Cymbalta, and recommended injections or a bone scan. Id. at 1002.

- On December 2, 2015, Dr. Tomkins filled out a Disability Impairment Questionnaire

---

[4] Between May 8, 2012 and November 6, 2013, Mercogliano visited Dr. Tomkins eleven times, but none of the appointments related to Mercogliano's severe physical impairments. See A.R. at 849-79.

which mirrored her November 6, 2013 Questionnaire. <u>Id.</u> at 994-98. Dr. Tomkins

opined that Mercogliano could not work, and that she would miss more than three

days of work per month if she did. <u>Id.</u> at 997-98.

C.    <u>Mercogliano's Mental Impairments</u>

Mercogliano's application also cited severe mental impairments, including major

depressive disorder, obsessive compulsive disorder ("OCD"), attention deficit hyperactivity

disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), and anxiety. <u>Id.</u> at 378. The

record contains the following relevant evidence regarding these impairments:

- On June 16, 2011, Mercogliano began mental health treatment at Elliot Community

  Human Services ("ECHS"). <u>Id.</u> at 749. Mercogliano reported racing thoughts,

  anxiety, depression, OCD, avoiding people, irritability, difficulty concentrating, and

  issues staying asleep. <u>Id.</u> Mercogliano also described past abuse by her mother,

  hospitalization for a suicide attempt at the age of thirteen, rape when she was eighteen

  or nineteen, daily heroin use until roughly four years earlier, and two months

  attending a methadone clinic to come off pain medications. <u>Id.</u> at 749-50. A mental

  status exam documented cooperative behavior; no reported delusional, suicidal, or

  other harmful thoughts; and normal appearance, speech, perception, thought content,

  intellectual functioning, and orientation. <u>Id.</u> at 751. However, Mercogliano's body

  movement was agitated, her mood reflected a lack of feelings, her affect was blunted,

  and her thought process was tangential. <u>Id.</u> She was diagnosed with opioid

  dependence, OCD, and major depressive disorder. <u>Id.</u> at 752. Her Global

  Assessment of Functioning ("GAF") score was 41.[5] <u>Id.</u>

---

[5] "GAF scores offer a snapshot of one's state at the time of the evaluation . . . ." <u>Summers v.</u>

- On August 6, 2011, Mercogliano saw a registered mental health nurse, Margaret Callahan, at ECHS for a medication consultation. Id. at 758. Ms. Callahan noted that Mercogliano had an anxious mood, but was pleasant, easily engaged, neatly groomed, and showed no abnormal motor movements. Id. Ms. Callahan suggested that Mercogliano start on Prozac, Vistaril, and Luvox, each of which treat anxiety, depression, and/or OCD. Id.

- On February 9, 2012, Mercogliano reported to Ms. Callahan that her medications were having only a small effect on her OCD symptoms, stating that she needed something to help her focus. Id. at 760. Ms. Callahan noted that Mercogliano had a blunted affect and suggested that she continue her medications and start Adderall. Id.

- After skipping an appointment in March, Mercogliano saw Ms. Callahan on May 1, 2012, and reported increased anxiety after a cousin was shot and paralyzed. Id. at 762. She was caring for two additional children from her extended family but denied problems with her medications. Id. The next month, Mercogliano told Ms. Callahan she was "feeling well." Id. at 763.

- Social worker Jessica Rickard authored a September 24, 2012 letter to the Massachusetts Rehabilitation Commission, stating that Mercogliano had been diagnosed with major depressive disorder, OCD, PTSD, and ADHD. Id. at 479.

- On November 15, 2012,[6] Mercogliano saw registered nurse practitioner Richard

Astrue, No. 10-cv-11792, 2011 WL 5508919, at *12 (D. Mass. Nov. 10, 2011) (quotation marks omitted). Scores ranging from 41 to 50 indicate serious symptoms, or serious impairments in social or occupational functioning. Diagnostic & Statistical Manual of Mental Disorders IV-TR 34 (4th ed. Am. Psychiatric Assoc. 2000). Scores ranging from 51 to 60 indicate moderate symptoms, or moderate impairments in social or occupational functioning. Id.
[6] Mercogliano appeared for five appointments at ECHS between July 3, 2012 and October 25,

Carey at ECHS. She reported poor sleep, a history of agoraphobia that increased with the birth of her son, and compulsively cleaning her whole house every day.  Id. at 770.  Her Luvox dose was increased.  Id.

- On December 13, 2012, Mercogliano saw Mr. Carey and reported that the increased dosage of Luvox was helping her.  Mr. Carey noted broad affect, euthymic mood, no delusions or paranoia, and organized thoughts.  Id.

- On December 27, 2012, Mercogliano was evaluated by an agency consultant, Dr. Michael Kahn.  Id. at 773.  Dr. Kahn found Mercogliano to be "pleasant and friendly, polite and respectful, without evidence of psychotic thinking."  Id. at 774.  However, he noted that she described "up and down" moods and that her affect was "somewhat overwhelmed and almost tearful."  Id.  Dr. Kahn diagnosed anxiety, with significant elements of complex PTSD and OCD.  Id. at 775.  Dr. Kahn opined that Mercogliano's medications "could be more aggressive," that it would be "most difficult" for her to return to her past work at that time, but that with more aggressive treatment she "might be able to leave the house and try working again."  Id. at 775.

-  On January 5, 2013, Dr. John Burke, a state agency psychologist, reviewed Mercogliano's records and found her to have moderate restriction in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Id. at 187.  Dr. Burke concluded that Mercogliano could perform simple tasks, and that she was not disabled.  Id. at 190.

- On January 10, 2013, Mercogliano reported to Mr. Carey that her OCD was the

2012, but the consultation notes are illegible.  A.R. at 764-69.

"worst that it had been," though her ADD was well controlled.  Id. at 815.  Mr. Carey increased her Luvox to three times per day.  Id. at 815.

- On February 14, 2013, Mercogliano told Mr. Carey that her status "could be better," citing increased family responsibilities, but she reported being better able to cope, that her OCD symptoms had improved significantly, and that Adderall was helpful but wore off too quickly.  Id. at 817.  The following month, Mercogliano reported that taking Adderall twice a day was working much better.  Id. at 819.

- On April 10, 2013, Dr. Robert Lasky, a state agency psychologist, reviewed Mercogliano's records and echoed Dr. Burke's January 2013 findings.  Id. at 211-20.

- On July 12, 2013, Mercogliano visited Mr. Carey reporting increased anxiety, which Mr. Carey found was a response to acute stressors.  Id. at 1035.  No change was made to her medications.  Id. at 1036.

- On that same day, Mr. Carey filled out a Psychiatric/Psychological Impairment Questionnaire in which he diagnosed Mercogliano with Major Depressive Disorder, OCD, ADHD, and assigned a GAF score of 53.  Id. at 928-35.  Mr. Carey's clinical findings included mood disturbance, social withdrawal, compulsions, intrusive recollections of a traumatic experience, generalized persistent anxiety, and irritability. Id. at 929.  Mr. Carey reported that Mercogliano was markedly limited in her ability to understand, remember, and carry out detailed instructions.  Id. at 931.  He noted various other moderate and mild limitations, indicated that Mercogliano would be capable of tolerating only low work stress, and opined that she would likely miss

work more than three times a month.  Id. at 931-35.[7]

- On November 8, 2013, Mercogliano returned to Mr. Carey and reported continued
  stress, but denied any concerns or adverse effects from her medication.  Id. at 1033.

- On January 2, 2014, Mr. Carey filled out a Psychiatric/Psychological Impairment
  Questionnaire in which he again diagnosed Mercogliano with Major Depressive
  Disorder, OCD, ADHD, and assigned a GAF score of 55.  Id. at 984.  His clinical
  findings included poor memory, sleep disturbance, mood disturbance, emotional
  lability, difficulty concentrating, social withdrawal, decreased energy, compulsions,
  and irritability.  Id. at 985.  Mr. Carey found that Mercogliano was markedly limited
  in her ability to: 1) remember locations and work-like procedures; 2) understand,
  remember, and carry out detailed instructions; 3) work with or near others without
  being distracted by them; 4) complete a normal workweek without interruptions from
  her symptoms and perform at a consistent pace without an unreasonable number and
  length of rest periods; and 5) interact appropriately with the general public.  Id. at
  987-88.  Mr. Carey again noted that Mercogliano would be incapable of handling
  even low stress at work, and that she would miss more than three days of work per
  month.  Id. at 990-91.

- Mr. Carey saw Mercogliano on January 10, May 8, and September 4, 2014.  Id. at
  1027-32.  The mental status exams were normal, and her diagnoses and medications
  were unchanged.  Id.  In the September 4, 2014 visit, Mercogliano "denied any

---

[7] Mr. Carey suggested that episodes of deterioration or decompensation were possible, as he
believed Mercogliano was using all of her coping abilities, such that any more stress would result
in instability. A.R. at 933.

psychiatric concerns or difficulties with her OCD or focus." Id. at 1027.

- On April 8, 2015, Mercogliano saw nurse practitioner Tracy Wilbraham. Id. at 1023. The hand written notes are illegible, but a week later Ms. Wilbraham prepared a Mental Impairment Questionnaire. Id. at 960. The findings, diagnoses, and limitations described by Ms. Wilbraham are the same as those reflected in Mr. Carey's January 2014 Questionnaire. Id. at 961-63.

- On June 10, 2015, Mercogliano presented to Ms. Wilbraham, who noted that Mercogliano's mood was stable and in good control. Id. at 1021. Ms. Wilbraham prescribed Clonidine for her ADHD and anxiety. Id.

- On August 12, 2015, Mercogliano visited Ms. Wilbraham complaining of anxiety. Id. at 1017. Ms. Wilbraham diagnosed her with PTSD, ADHD, and OCD, but noted that Mercogliano's rituals were in remission. Id.

- On September 15, 2015, Mercogliano complained to Ms. Wilbraham of mood fluctuation, as well as sleep disturbance. Id. at 1014. Ms. Wilbraham's diagnoses and notes were unchanged. Id.

- On November, 23, 2015, social worker Kiah Banfield from ECHS opined in a latter that it would be difficult for Mercogliano to work on a daily basis without becoming overwhelmed and irritated in the work place. Id. at 1080. Ms. Banfield also prepared a Mental Impairment Questionnaire reflecting diagnoses of PTSD, OCD, Major Depressive Disorder, and ADHD. Id. at 1081. She identified the following symptoms: depressed mood, anxiety, irritable and labile affect, hostility, past suicide attempts, difficulty concentrating, easy distractibility, deeply ingrained maladaptive patterns of behavior, impulsive behavior, and unstable interpersonal relationships. Id.

at 1083.  Ms. Banfield also noted that Mercogliano had experienced episodes of decompensation or deterioration in a work setting, explaining that Mercogliano can become easily overwhelmed.  Id. at 1084.  Ms. Banfield noted that Mercogliano would likely miss, on average, three or more days of work per month.  Id. at 1085.

- On June 1, 2016, Mercogliano saw Dr. Daniel R. Morocco "to assess her current levels of function."  Id. at 45.  Mercogliano arrived twenty minutes late for the appointment and presented with "slurred and at times incoherent speech, watery eyes, eyes rolling into the back of her head when asked different questions, eyes partially closed at various points during [the] assessment and an inability to remain still."  Id. at 46.  Mercogliano denied any substance abuse, but Dr. Morocco noted that these behaviors were consistent with drug use.  Id. at 50.  Mercogliano reported having significant nightmares, difficulty sleeping, having a poor appetite, and feeling drained.  Id. at 46.  Her mood and affect were flat.  Id.  Dr. Morocco described Mercogliano's overall mental exam as "completely unremarkable" and noted that, "for the most part her speech was clear, coherent, goal oriented and free from cognitive distortion."  Id.  He rated Mercogliano's attention, concentration, frustration tolerances, memory, insight, and judgment as fair.  Id.  He concluded Mercogliano's abilities ranged from mildly-to-borderline intellectually disabled, and that her personality profile was morbidly depressed, with heightened anxiety, agitation, and impaired social orientation.  Id. at 50.  Dr. Morocco diagnosed PTSD, persistent depressive disorder, bipolar disorder, and generalized anxiety disorder.  Id. at 51.

- That same day, Dr. Morocco reiterated his diagnoses in a Mental Impairment Questionnaire.  Id. at 40.  He noted the following symptoms: anxiety, blunt and flat

affect, mood disturbances, suicidal ideation, a past suicide attempt, difficulty

concentrating, easy distractibility, paranoia, an inability to feel pleasure, pervasive

loss of interest, weight change, decreased energy, maladaptive patterns of behavior,

hyperactivity, psychomotor agitation, social withdrawal, nightmares, and difficulty

sleeping.  Id. at 41.  Dr. Morocco also noted Mercogliano had reduced intellectual

functioning and had suffered from unspecified episodes of decompensation.  Id. at 42.

He found Mercogliano to be markedly limited in most listed areas, and moderately-

to-markedly limited in all of the rest.  Id. at 43.  Dr. Morocco noted that if

Mercogliano were to work, she would likely be absent more than three times per

month; he believed her symptoms had been present since January 1, 2010.  Id. at 44.

D.      Mercogliano's Testimony

On December 10, 2015, Mercogliano appeared before the ALJ and testified that she

suffers from the following symptoms: anxiety that causes her to engage in extensive rituals and

makes it difficult for her to leave her house; depression that makes it difficult for her to get out

of bed and causes her to cry twice a day; difficulty sitting still and concentrating; difficulty

sleeping and staying asleep; difficulty reaching and bending; difficulty walking and sitting;

difficulty doing physical activities with her son; and severe pain.  Id. at 112-26.

Mercogliano testified that her medications help with her symptoms, though not fully,

and that they do not produce any side effects.  Id. at 122.  According to Mercogliano's

testimony, on a normal day she wakes up at 4 a.m. to ensure that her stove is turned off, her

windows are locked, and her heaters are unplugged.  Id. at 124.  She goes grocery shopping at 5

a.m. in order to avoid other people.  Id. at 130.  She walks two blocks to drop her son off at his

bus stop, sits for five to ten minutes, and then walks back to her apartment without the use of

any assistive devices.  Id. at 125.  Mercogliano testified that she typically spends the rest of the morning cleaning her apartment.  Id. at 129.  She also said that she frequently gets depressed in the mornings.  Id.  Mercogliano said she spends the afternoon sitting and listening to music (frequently depressed, anxious, and crying), until she walks to and from her son's bus stop again after school.  Id. at 130-31. During the evening, she cooks dinner and reads to her son.  Id. at 131.  After her son goes to bed, she lies in bed with headphones on until she falls asleep.  Id. at 132.

Mercogliano testified that she can: perform all the household chores necessary to take care of her and her son; drive for two-and-a-half hours and use GPS; use a computer; attend regular appointments and meetings; and lift two gallons of milk, if handed to her.  E.g., id. at 126, 128, 130, 135.  According to Mercogliano, she refused a spinal injection to treat the pain in her foot because her "father has had it done and it didn't work," and because, as a recovering heroin addict, she does not like needles.  Id. at 137-38.

E.      The VE's Testimony

Mercogliano was thirty-two years old at the time of the ALJ hearing.  Doc. No. 18 at 2. The VE testified that a person of Mercogliano's "age, education, and experience, able to perform at the light level, "who could never crouch, kneel, or climb ladders, ropes, or scaffolds," and whose "work [was] limited to simple, routine, repetitive tasks, [with] only occasional interaction with the public" would be able to perform Mercogliano's past relevant work as a garment folder.  A.R. at 145-46.  The VE also testified that such a person would be able to work as a merchandise tagger or an electrical accessories assembler.  Id. at 146.

The VE answered a further hypothetical, describing a person of Mercogliano's age, education, and experience; able to perform work at the sedentary level, provided she could sit or

stand alternatively at will; remaining on task for at least ninety percent of the work period; unable to crouch or kneel; limited to simple, routine, repetitive, non-tandem tasks, in a work environment free of fast-paced production requirements; able to make only simple work-related decisions with few, if any, workplace changes; and able to be around coworkers for only one-third of the work day.  Id. at 146-47.  The VE testified that such a person could work as a table worker, a printer circuit board assembly inspector, or a semi-conductor inspector.[8]  Id. at 147.

     F.     The Administrative Decision

After determining Mercogliano met the insurance requirements of the Social Security Act during the relevant time period, the ALJ conducted the usual five-step sequential evaluation to determine Mercogliano's disability claim.[9]  Id. at 69-70.  At step one, the ALJ found that Mercogliano had not engaged in substantial gainful activity since her alleged onset date.  Id. at 70.  At step two, the ALJ found Mercogliano suffers from the following severe impairments: right ankle pain secondary to RSD; lumbar radiculopathy; anxiety disorder;

---

[8] The VE opined that a person of Mercogliano's age, education, and past work experience who would be off task twenty percent of the time would not be able to do any of the work previously mentioned, nor could a person who would be absent from work three or more days per month. A.R. at 148-49.  Mercogliano has not tied any of her challenges in this Court to a dispute about the percentage off time she could be on task or on the number of days she might miss each month.  No medical opinion before this court addresses the former question, and, as will be explained below, substantial evidence supports the ALJ's decision not to accord controlling or great weight to any of the opinions addressing the latter question.

[9] The five steps of the requisite analysis are: 1) whether the claimant is engaged in substantial gainful activity (if so, she is not disabled and the inquiry ends); 2) whether the claimant has a severe impairment or combination of impairments that is severe (if not, she is not disabled and the inquiry ends); 3) whether any of the claimant's impairments meet or medically equal an impairment listed in an appendix to the relevant regulations (if so, she is disabled and the inquiry ends); 4) whether the claimant is able to perform her past relevant work (if so, she is not disabled and the inquiry ends); and 5) considering the claimant's age, education, work experience, and RFC, whether she is able to perform other work (if not, she is disabled).  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

depressive disorder; OCD; and ADHD. Id. at 70. At step three, the ALJ found that none of Mercogliano's conditions met or equaled those impairments listed in the relevant appendix to the regulations—a finding that Mercogliano does not dispute here. Id. at 71. The ALJ found that Mercogliano has mild restrictions in activities of daily living, and moderate difficulties in social functioning, concentration, persistence, and pace. Id. at 72.

After step three, the ALJ considered Mercogliano's residual functional capacity ("RFC"),[10] and found that Mercogliano could perform "light work"[11] except that she "could never crouch, kneel, or climb ladders, ropes or scaffolds" and "could perform simple, routine, repetitive tasks involving only occasional interaction with the general public." Id. at 73. In so concluding, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as opinion evidence. Id. at 73.

Regarding Mercogliano's severe physical impairments, the ALJ based his finding on the record as a whole, noting that Mercogliano received "mostly conservative treatment" during the early portion of the time period in question, and that treatment for her physical impairments has tapered off significantly since then. Id. at 80. The ALJ gave "less" weight to the opinions of Drs. Tomkins, Milosavljevic, and Slovenkai. Id. at 80-81. Regarding

---

[10] An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e).
[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Mercogliano's severe mental impairments, the ALJ based his finding on the record as a whole, and gave "some weight" to the assessments of Drs. Lasky and Burke. A.R. at 80. The ALJ afforded "less weight" to the opinions of Dr. Kahn, Ms. Rickard, Mr. Carey, Ms. Wilbraham, and Ms. Banfield. Id. at 80-82. The ALJ also found that, to the extent Mercogliano testified to limitations greater than he found, her testimony was not credible. Id. at 82.

With the RFC determination in mind, as well as the testimony of Mercogliano and the VE, the ALJ concluded at step four that Mercogliano was able to return to her past work as a garment folder. Id. at 83. At step five, the ALJ found in the alternative that Mercogliano could perform work as a package sorter, a tagger, and an electrical accessories assembler, and that these jobs existed in significant numbers in the national economy. Id. at 84-85. As such, the ALJ concluded that Mercogliano was not disabled. Id. at 85.

II.    LEGAL STANDARDS

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Id. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); accord Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); see Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (noting substantial evidence is less than a preponderance of the evidence). Conversely, where the Commissioner's finding is not supported by substantial evidence or is the result of an error of law in the evaluation of the claim, the Court will not uphold it. § 405(g).

Where the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991); see Richardson, 402 U.S. at 399 (noting resolution of conflicts in evidence, including medical evidence, is the Commissioner's task). As the Supreme Court has emphasized, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981) (internal quotations omitted). Administrative findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). Moreover, an ALJ is not permitted to "substitute his own layman's opinion for the findings and opinion of a physician," Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987), nor may he disregard relevant medical evidence. Nguyen, 172 F.3d at 35.

ALJs commonly review assessments provided by three categories of medical experts: sources who have treated the claimant for their impairments, sources who have examined the claimant for purposes of rendering an opinion in connection with their disability claim, and sources who have reviewed the claimant's medical records in order to render an opinion in connection with their claim but have not treated or examined them. See generally 20 C.F.R. §§ 404.1527, 416.927. "A treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). In other words, there is "a

general presumption of deference to the treating physician's opinion." Abubakar v. Astrue, No. 1:11-cv-10456-DJC, 2012 WL 957623, at *8 (D. Mass. Mar. 21, 2012).

Where an ALJ does not give controlling weight to a treating physician's opinion, he must determine how much weight to accord the opinion based on such factors as: "1) length of treatment relationship and frequency of examination; 2) nature and extent of the treatment relationship; 3) how well supported the conclusion is by relevant evidence; 4) how consistent the opinion is with the record as a whole; [and] 5) how specialized the knowledge is of the treating physician." Id. at *9. He must give "good reasons" explaining his decision about what weight should be accorded to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Additionally, "when the ALJ cannot determine the basis of a treating physician's opinion from the record," the agency requires him to make efforts to obtain clarifying information from the physician. Abubakar, 2012 WL 957623, at *11; see Soto-Cedeño v. Astrue, 380 F. App'x 1, 2 (1st Cir. 2010) (per curiam).

The opinions of other examining and non-examining sources are accorded weight based on the extent to which they are supported by relevant evidence, whether they are consistent with the rest of the medical record, the level of specialized knowledge demonstrated by the source, and any other relevant factors. Abubakar, 2012 WL 957623, at *11; 20 C.F.R. §§ 404.1527(c), 416.927(c). In general, opinions rendered by doctors who have examined the claimant are accorded more weight than those offered by sources who have not done so. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

III.    DISCUSSION

Mercogliano urges that the ALJ's determination was contrary to the law and not supported by substantial evidence. Doc. No. 1 at 3. The Court rejects each of her claims of error

below.

A.     The Medical Opinion Evidence and RFC Assessment

Mercogliano criticizes several aspects of the ALJ's determination of what weight to assign various medical source opinions, as well as the ALJ's assessment of Mercogliano's residual functional capacity.  None of Mercogliano's criticisms justify remand.

1.     *Dr. Tomkins's Opinion Regarding Mercogliano's Physical Impairments*

First, Mercogliano alleges that the ALJ erred in assigning "less" weight to Dr. Tomkins's medical opinion.  Doc. No. 18 at 20.  Mercogliano argues that Dr. Tomkins's opinions were based upon appropriate medical findings documented throughout the record, were not contradicted by other substantial evidence in the record, and should have been given controlling weight.  Id.  This interpretation of the record, however, fails to account for the substantial evidence which the ALJ permissibly found contradicted Dr. Tomkins's opinions: namely, Mercogliano's history of conservative, effective treatment, and her activities of daily living.

Dr. Tomkins opined that "even with maximal safe medication" Mercogliano is incapable of returning to work.  E.g., A.R. at 997-98.  However, the record contains evidence that other examining physicians suggested various treatment modalities from which Mercogliano may have benefited, but which Mercogliano chose not to pursue.  See, e.g., A.R. at 632 (noting that Mercogliano has not tried long-acting narcotics, or therapeutic steroid injections); A.R. at 471, 634, 1002 (suggesting that Mercogliano could benefit from MRI, injection therapy, a bone scan, or Cymbalta); See also, A.R. at 137-38 (stating Mercogliano refused to undergo spinal injection therapy).

"Implicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work."  Tsarelka v. Sec'y of Health & Human Servs.,

842 F.2d 529, 534 (1st Cir. 1988). The record here makes it clear that Mercogliano has not yet

attempted several treatment alternatives, and there is no basis to conclude that such alternatives

would be unsuccessful. From this evidence, which contradicts Dr. Tomkins's medical opinion

evidence, the ALJ reasonably inferred that Mercogliano's treatment for her physical impairments

had been conservative. A.R. at 80-81, 82-83; see Genereux v. Berryhill, No. 15-13227-GAO,

2017 WL 1202645, at 3* (D. Mass. Mar. 31, 2017) (finding that the conservative treatment plans

suggested by some doctors supported the ALJs determination to give a treating physician less

than controlling weight).

Dr. Tomkins further opined that Mercogliano is incapable of working due to disabling

pain. E.g., A.R. at 997-98. However, the ALJ found that Mercogliano's daily activities, along

with the evidence of other available treatment options, contradict this assessment.

For example, in spite of her pain, Mercogliano has testified that she is capable of doing

"just about every chore around the apartment" for her and her son. Id. at 130. These chores

include walking her son to and from the bus stop, cooking, grocery shopping, and cleaning "all

day every day." Id. at 124-26, 130-31, 401, 405. She has also testified that for a period she was

able to spend "way more" time on her feet to take care of two other children as well. Id. at 880.

Mercogliano argues that these activities are not necessarily inconsistent with Dr.

Tomkins's assessed limitations. However, even if "the record arguably could support a

different conclusion," Irlanda Ortiz, 955 F.2d at 770, as Mercogliano urges, substantial

evidence supports the ALJ's finding that Mercogliano's activities of daily living, in

combination with her history of conservative treatment, contradict Dr. Tomkins's assessment.

This is especially so where, as here, Dr. Tomkins did not specifically address the relationship

between the assessed limitations and Mercogliano's daily activities, and the ALJ gave good

reasons for treating Dr. Tomkins's opinion as he did. In these circumstances, this Court will not disturb the weight assigned to Dr. Tomkins's medical opinion evidence.

### 2. *Mercogliano's Physical RFC*

Mercogliano alleges, and the Commissioner concedes, that the ALJ's physical RFC determination is not supported by substantial evidence. Doc. No. 18 at 21-22; Doc. No. 25 at 26. Mercogliano correctly points out that the ALJ chose not to adopt the RFC assessments of any of the physicians who evaluated Mercogliano, and in the absence of their opinions arrived at a physical RFC that is wholly unsupported. In effect, the ALJ impermissibly relied on his own lay assessment of the record. See Gonzalez Perez, 812 F.2d at 749 (an ALJ is not permitted to "substitute is own laymen's opinion for the findings and opinion of a physician"). The Commissioner argues, however, that in this case the error is harmless based on the VE's testimony. Doc. No. 25 at 26-27.

As explained in Section C below, the VE's response to a valid hypothetical question demonstrates that a person of Mercogliano's age, education, and experience, with physical and mental limitations greater than those assessed by the ALJ, still would be capable of performing work that exists in sufficient numbers across the nation. A.R. at 146-48. There is no evidence in the record to support a physical RFC more limited than that proposed in the relevant hypothetical. Remand is therefore unnecessary. See Ward v. Comm'r of Soc. Sec., 211 F3d 652, 656 (1st Cir. 2000) (holding that remand was unnecessary because the result would undoubtedly have been the same).

### 3. *The Mental Health Opinion Evidence*

The ALJ gave "some weight" to the assessments of Dr. Lasky and Dr. Burke, and "less weight" to the opinions of Dr. Kahn, Mr. Carey, Ms. Wilbraham, and Ms. Banfield. A.R. at 80-

82.  Mercogliano argues, first, that Mr. Carey, Ms. Wilbraham, and Ms. Banfield should have been given greater weight, and second, that the ALJ should not have relied on the medical opinion evidence of Drs. Lasky and Burke.  Doc. No. 18 at 22, 25-26.  Mercogliano also urges that the ALJ was required to request clarification of Dr. Kahn's opinion.  Doc. No. 18 at 25 n. 28.

a.    <em>Mr. Carey, Ms. Wilbraham, and Ms. Banfield</em>

Mercogliano concedes that Mr. Carey, Ms. Wilbraham, and Ms. Banfield are considered "other sources," rather than "acceptable medical sources," in the Commissioner's Regulations, and that therefore their opinions cannot be given controlling weight.  Doc. No. 18 at 22; <u>see generally</u> 20 C.F.R. §§ 404.1512, 404.1527(a)(2), 416.912, 416.927(a)(2).  However, Mercogliano argues that the ALJ was nonetheless required to consider and weigh their opinions "within the framework of the treating physician rule," and to accord them greater weight.  Doc. No. 18 at 22.

First, the ALJ did not completely discount the opinion evidence of these "other sources"; he merely afforded them "less weight" than the opinion evidence of Drs. Burke and Lasky.  A.R. at 80-82.  Implicit in this assessment is that their opinions informed the ALJ's reasoning to some extent.

Second, Mercogliano errs insofar as she argues that the ALJ was required to do anything further than consider and address the "other source" opinions.  The weight assigned to "other source" evidence will vary from case to case, and the factors which are used to evaluate opinions from "acceptable medical sources" "*can* be applied to opinion evidence from 'other sources'" as well.  SSR 06-03p, 2006 WL 2329939, at *5 (emphasis added); <u>see</u> 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6) (listing factors used to evaluate opinions from

acceptable medical sources).  Furthermore, not every factor in 20 C.F.R. §§ 404.1527(c)(1)-(6) and 416.927(c)(1)-(6) will be relevant in every case, and there is a distinction between what the ALJ must *consider* and what he must *explain*.  SSR 06-03p, 2006 WL 2329939, at *6-7.  All the ALJ must do is explain the weight given to the "other source" opinions or "otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  Id.  The ALJ offered such an explanation here.  A.R. at 80-82.

The ALJ plainly considered the opinions of Mr. Carey, Ms. Wilbraham, and Ms. Banfield in light of the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c), and provided his reasoning for the weight he assigned them in his decision.  A.R. at 80-82.  Mercogliano argues that the factors "all weigh in favor of crediting the opinions of the mental health professionals."  Doc. No. 18 at 23.  However, this argument fails to account for substantial evidence which the ALJ found contradicted their assessments, including Mercogliano's history of conservative and effective mental health treatment, her mental status examinations (which were generally within normal limits), and her reported activities of daily living.  A.R. at 81-82.

When Dr. Kahn evaluated her on December 27, 2012, Mercogliano was taking Adderall and Luvox.  Id. at 813.  Dr. Kahn opined that this treatment "could be more aggressive," and that he believed Mercogliano could possibly return to work if her treatment were more aggressive.  Id. at 775.  However, on March 14, 2013, Mercogliano reported that her prescribed medications were working for her, and denied any need to change her regimen.  Id. at 819.  In fact, by July 10, 2015, only minor changes had been made to Mercogliano's pharmacological treatment.  See id. at 1016 (reflecting addition of Clonidine and Trazadone).

Ultimately, the record shows that once Mercogliano began her regimen of Adderall and Luvox, she required very little variation in her prescription; she consistently reported that she was benefitting from her medication and that her symptoms were under control.  E.g., id. at 787, 817, 1017.  The ALJ also noted that Mercogliano had not required psychiatric hospitalization during the relevant time period.  Id. at 82.  This evidence is sufficient to support the ALJ's determination that Mercogliano's mental health treatment was conservative.  See Roshi v. Comm'r of Soc. Sec., No. 14-10705-JGD, 2015 WL 6454798 at *7, *8 (D. Mass. Oct. 26, 2015) (finding that treatment which focused on medication and therapy was conservative); Silvia v. Colvin, No. 13-11681-DJC, 2014 WL 4772210, at *20, *25 (D. Mass. Sept. 22, 2014) (finding that treatment which consisted of only medication and weekly counseling sessions, with no evidence of psychiatric hospitalization, was conservative).

The ALJ's determination that Mercogliano's treatment was conservative, and that this conservative treatment contradicted their opinion evidence, is itself sufficient to support the ALJ's decision to grant "less weight" to Mr. Carey, Ms. Wilbraham, and Ms. Banfield.  See McNelley v. Colvin, No. 15-1871, 2016 U.S. App. LEXIS 10155, at *5 (1st Cir. Apr. 28, 2016) (holding that "conservative treatment with only medical management" constitutes substantial evidence to support an ALJ's decision to give less weight to one medical source than another); Ramos v. Barnhart, 119 F. App'x 295, 296 (1st Cir.  2005) (same).  Mercogliano's consistently normal mental status exams and reported activities of daily living also contradict the relevant opinion evidence, providing further support for the ALJ's assignment of weight.  See, e.g., A.R. at 124-26, 130-31, 401, 405, 751, 787, 1027-1030, 1035.

b.    *Drs. Lasky and Burke*

Mercogliano alleges that the ALJ should not have relied upon the medical opinion

evidence of Drs. Lasky and Burke for two reasons: first, that Drs. Lasky and Burke reviewed limited records; and second, that because of the nature of mental illness, non-treating, non-examining consultants' opinions should be considered less important than those of examining sources.  Doc. No. 18 at 22-26.

The weight afforded to non-examining, non-treating physicians and psychologists will vary from case to case based on the nature of the illness, and the completeness of the evidence evaluated by the expert.  Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994).  Given the limited record evaluated by Drs. Burke and Lasky, the cursory nature of their assessments, and the subjective nature of symptoms of mental illness, the ALJ might have erred had he given either of their opinions *controlling* weight, or relied on their evidence *alone*.  Cf. Rodriguez Torres v. Sec'y of Health & Human Servs., 915 F.2d 1557 (Table), 1990 WL 152351, at *3-4 (1st Cir. Sept. 18, 1990) (unpublished) (noting a "marked preference" for the opinion of an examining physician where a claimant alleges disabling pain, but finding an exception because of the non-examining physician's thoroughness and the completeness of the record he evaluated); Resendes v. Astrue, 780 F. Supp. 2d 125, 141 (D. Mass. 2011) (finding that the opinion evidence of a non-examining, non-testifying psychologist was "too cursory to provide basis upon which to rest a finding that the claimant was not disabled").

However, the ALJ did not give controlling weight to the opinions provided by Dr. Lasky and Dr. Burke, nor did he rely solely upon them.  A.R. at 80-82.  In fact, the ALJ gave their evidence only "some" weight, and explicitly acknowledged that their assessments were conducted at an early stage in Mercogliano's treatment.  Id.  Moreover, the ALJ assigned Mercogliano a mental RFC reflecting greater limitations than those assessed by either of the doctors.  Compare A.R. at 71, 73 with A.R. at 187, 215.  Thus, in formulating Mercogliano's

mental RFC, the ALJ clearly considered other evidence throughout the record as well.

Furthermore, Dr. Burke's and Dr. Lasky's opinions are consistent with substantial evidence throughout the record as a whole. "[W]hile generic deference is reserved for treating source opinions, the regulations also presuppose that non-treating, non-examining sources may override treating doctor opinions, provided there is support for the result in the record." Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037 (Table), 1994 WL 251000, at *4 (1st Cir. June 9, 1994) (unpublished) (citing 56 Fed. Register 36931, 36936 (Aug. 1, 1991)); see Roshi, 2015 WL 6454798 at *12 (holding that the ALJ's decision to adopt the opinions of a non-examining, non-treating consultant over those of claimant's treating, examining sources was supported by substantial evidence); Silvia, 2014 WL 4772210, at *21-22 (finding that the ALJ was justified in relying on the opinion evidence of two non-examining advisors because their opinions were consistent with the record).

Drs. Burke and Lasky both found that Mercogliano suffered from moderate restrictions in activities of daily living, mild restrictions in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. A.R. at 187, 215. This is consistent with Mercogliano's mental status exams, which the ALJ fairly characterized as being "generally within normal limits." Id. at 81; e.g., id. at 751, 787, 1027-30, 1035. This range of restrictions is also consistent with evidence that Mercogliano has been capable of taking care of three children at once; that she has been capable of driving and following a GPS to unfamiliar locations; and that she has consistently reported satisfaction with her medications and their ability to control her symptoms. E.g., id. at 762, 128, 134, 1027.

As such, substantial evidence supports the ALJ's decision to afford Dr. Burke's and Dr. Lasky's opinion evidence "some" weight—a decision which this Court will not disturb.

c.    *Dr. Kahn*

The ALJ afforded "less weight" to the opinion evidence of Dr. Kahn, doing so in part because Dr. Kahn "simply concluded that [Mercogliano] could perform some jobs but not her past work" without providing a function-by-function assessment of Mercogliano's abilities and limitations.  A.R. at 80.  Mercogliano argues the ALJ "rejected" Dr. Kahn's opinion because it was vague, and that "this triggered the ALJ's duty to request clarification of the opinion."  Doc. No. 18 at 25 n.29 (citing 20 C.F.R. §§ 404.1519p, 404.1527(c)(3), 416.919p, 416.927(c)(3)).

Mercogliano mischaracterizes both the ALJ's treatment of Dr. Kahn's opinion, and his reasons for such treatment.  See Doc. No. 18 at 25 n.28.  The ALJ did not "reject" Dr. Kahn's evidence, he merely afforded it "less" weight.  A.R. at 80.  Likewise, the ALJ did not find that Dr. Kahn's opinion was "vague," he merely noted that it did not contain a function-by-function analysis of Mercogliano's abilities and limitations.  A.R. at 80.

An obligation to contact a medical source for clarification "exists only where the ALJ is 'unable to ascertain the basis of the opinion.'"  Bakoian v. Berryhill, No. 13-cv-13021-LTS, 2018 WL 1513025, at *6 (D. Mass. Mar. 27, 2018) (quoting Conte v. Mahon, 472 F. Supp. 2d 39, 49 (D. Mass. 2007)).  Dr. Kahn's report is clear and thorough.  It contains analyses of Mercogliano's situation at the time; her psychiatric, medical, and social histories; and a mental status exam.  A.R. at 773-75.  Although the report does not contain a function-by-function assessment, Mercogliano provides no authority requiring that the report contain such an assessment.  In these circumstances, the ALJ was not required to seek clarification from Dr. Kahn.[12]

_____

[12] Though Mercogliano does not explicitly allege it, implicit in her argument that the ALJ could

B.    Mercogliano's Credibility

Mercogliano alleges that the ALJ's credibility determination is not supported by substantial evidence.  Doc. No. 18 at 26-27.  In his decision, the ALJ explained that to the extent Mercogliano testified to limitations greater than he found, her testimony was not credible.  Id. at 82-83.  In explaining this determination, the ALJ noted that the treatment of Mercogliano's physical and mental impairments has been effective and conservative; that the record contains no evidence of side effects from, or drastic changes to, Mercogliano's medication; and that Mercogliano's reported activities of daily living were "not generally consistent with her allegations of disabling physical and mental impairment."  Id. at 83.

The determination of a claimant's credibility is the sole responsibility of the ALJ, and the reviewing court must uphold such a determination if a reasonable mind could find the evidence adequate to justify it.  Rodriguez, 647 F.2d at 222.  Here, the ALJ's credibility determination arises from the same evidence that supported his decisions to afford "less weight" to the opinions of Dr. Tomkins, Dr. Kahn, and the other sources—evidence which is adequate to uphold his credibility determination as well.

As discussed above, the treatment of Mercogliano's physical and mental impairments can be fairly characterized as conservative, and she consistently reported satisfaction with her

_____

not rely on the opinion evidence of Drs. Burke and Lasky is an assertion that the ALJ's mental RFC determination is not supported by substantial evidence.  Doc. No. 18 at 22-26. This assertion is wrong. The ALJ afforded the opinions of Drs. Burke and Lasky "some" weight, and afforded "less" weight to the opinion evidence of Dr. Kahn, Mr. Carey, Ms. Wilbraham, and Ms. Banfield. A.R. at 80-82.  The ALJ also noted that he considered the objective medical evidence throughout the record as a whole. E.g., id. at 80.  Mercogliano's mental status exams and her activities of daily living, taken alongside the opinions of Drs. Burke and Lasky, support the ALJ's mental RFC determination.  See Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 328-29 (1st Cir. 1990) (per curiam) (finding that opinion of non-examining, non-treating state agency physician, plus consistent medical evidence, constituted substantial evidence to support ALJ's RFC determination).

medications. This contradicts Mercogliano's claims that her pain cannot be alleviated. E.g., id. at 125-26. In addition, the activities of daily living discussed above conflict with Mercogliano's assertions of disabling pain and support the ALJ's reservations about her credibility.

This evidence, taken together and in the context of the record as a whole, is sufficient to support the ALJ's credibility determination.

C.      The VE's Testimony

Mercogliano next argues that the ALJ improperly relied on the VE's testimony where the hypotheticals proposed to him failed to capture all of her mental limitations. Doc. No. 18 at 27. The ALJ found Mercogliano to have moderate difficulties with social functioning, concentration, persistence, and pace. A.R. at 71-72. Mercogliano argues that the hypotheticals presented to the VE failed to account for such difficulties. Doc. No. 18 at 28.

"For a VE's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Viveiros v. Astrue, No. 10-11902-DJC, 2012 U.S. Dist. LEXIS 133534, at *22 (D. Mass. Sept. 19, 2012) (quotation marks omitted). Thus, "[f]ailing to include a functional limitation in a hypothetical question to a VE requires a case to be remanded." Id. However, the hypothetical need not contain the language of the limitation verbatim. See Bourinot v. Colvin, 95 F. Supp. 3d 161, 183 (D. Mass. 2015) (finding that references within the hypothetical to the claimant's difficulties with concentration, memory, attending to tasks, following instructions, and conforming to changes, were sufficient to capture her moderate difficulties in concentration, persistence, or pace); Dias v. Colvin, 52 F. Supp. 3d 270, 284 (D. Mass. 2014) (finding that questions regarding claimant's ability to remember simple

information for a two-hour period accurately captured her moderate difficulties in concentration, and that questions limiting claimant to performing simple tasks over a two hour period adequately captured her moderate difficulties in persistence and pace).

Here, the ALJ presented the VE with two hypotheticals. One of them described a person of Mercogliano's age, education, and experience; able to perform work at the sedentary level, provided she could sit or stand alternatively at will; able to remain on task for at least ninety percent of the work period; unable to crouch or kneel; limited to simple, routine, repetitive, non-tandem tasks, in a work environment free of fast-paced production requirements; able to make only simple work-related decisions with few, if any, workplace changes; and able to be around coworkers for only one-third of the day. Id. at 146-47. The VE testified that such a person would be able to perform three jobs that account for a total of 41,000 positions nationwide. Id. at 147.

This hypothetical adequately accounts for Mercogliano's limitations. The "no tandem tasks" and "few if any workplace changes" language adequately addresses Mercogliano's moderate difficulties in concentration. The "free of fast-paced work production requirements" and "simple, work-related decisions" language adequately covers her moderate difficulties in persistence and pace. And the limit on time spent with coworkers adequately accounts for her moderate difficulties with social functioning.

All of this language combined, along with the limitation to "simple, routine, repetitive tasks," accounts for the moderate difficulties identified by the ALJ. Accord Bourinot, 95 F. Supp. 3d at 183; Dias, 52 F. Supp. 3d at 284. This is especially true in light of the evidence that, although Drs. Burke and Lasky found Mercogliano to have moderate difficulties in concentration, persistence, or pace, they both opined that she nevertheless could perform

"simple and non-complex tasks." A.R. at 189, 218. In these circumstances, the hypothetical was adequate, and the ALJ did not err in relying upon the VE's response.

    D.    Dr. Morocco's Opinion

While her appeal of the ALJ's decision was pending, Mercogliano was assessed by Dr. Morocco. She submitted his report to the Appeals Council for consideration. A.R. at 1, 45. In declining review, the Appeals Council explained that it would not consider Dr. Morocco's Mental Impairment Questionnaire, as it was dated June 1, 2016 (four months after the ALJ's decision) and did not relate to the period at issue. Id. at 2.

"[A]n Appeals Council's refusal to review an ALJ's decision may be reviewable where it gives an egregiously mistaken ground for this action." Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001). However, the "egregiousness standard" set forth in Mills can be applied only if the Appeals Council's reasoning is sufficiently articulated. Rosado v. Banhart, 340 F. Supp. 2d 63, 67 (D. Mass. 2004).

Here, the Appeals Council's reasoning was sufficiently clear, and its grounds for refusing to review the ALJ's decision were not egregiously mistaken. The regulations governing administrative appeals in this context make it clear that, in order for additional evidence to justify review of an ALJ's decision, such evidence must be new, material, related to the period at issue on or before the date of the hearing decision, and reasonably expected to change the outcome of the decision. 20 C.F.R. §§ 404.970(a)(5),(b), 416.1470(a)(5),(b).

The Appeals Council clearly explained that Dr. Morocco's questionnaire did not relate to the period at issue because it was performed after the ALJ issued his decision. This conclusion is supported by Dr. Morocco's own explanation that Mercogliano was referred to him "for a psychological evaluation to assess *her current levels of functioning*." A.R. at 45

(emphasis added).  It was not an "egregious" error for the Appeals Council to determine that an evaluation of Mercogliano's level of functioning on June 1, 2016 did not relate to her functioning several months earlier.  See <u>Mills</u>, 244 F.3d at 5 (holding that the Appeals Council's decision not to consider evidence was not egregious, even though said evidence was new and material).

Dr. Morocco's summarily stated belief that the symptoms and limitations resulting from Mercogliano's mental impairments had been present since January 1, 2010, A.R. at 44, does not render the Appeals Council's decision egregious.  Dr. Morocco saw Mercogliano only once, in June 2016, and there is no indication that he reviewed any of her medical records.  <u>Id.</u> at 40-51.  The only reference he made to the January 2010 date was on a form questionnaire, where he did not explain the basis for selecting that date.[13]  Furthermore, the record establishes that Mercogliano was, in fact, working until May 20, 2010.  <u>Id.</u> at 113-14.

Accordingly, the Appeals Council committed no error justifying this Court's review.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Mercogliano's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 17) is DENIED, and the Commissioner's motion for an order affirming her decision (Doc. No. 24) is ALLOWED.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge

---

[13] The January 2010 date appears to have been typed in the form by someone else; Dr. Morocco completed the listed questions by hand, checking lines next to the appropriate responses or writing brief phrases where narrative answers were requested.  A.R. at 40-44.  The January 2010 date does not appear in the typed report Dr. Morocco submitted along with the questionnaire; the report merely repeats Mercogliano's statement that she stopped working "in 2010" due to a physical injury she suffered at work, without connecting that injury to the mental impairments that were the subject of Dr. Morocco's evaluation.  <u>Id.</u> at 45-52.